United States District Court
Southern District of Texas
**ENTERED**
August 08, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ELIZABETH LAKEMPER, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-25-2881 |
| | § | |
| HOPPER (USA) INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This is a discrimination and retaliation case. Elizabeth LaKemper sued Hopper (USA) Inc., her former employer, asserting claims for sex discrimination and retaliation under Title VII. (Docket Entry No. 27). LaKemper alleges that Hopper frequently treated her and female coworkers worse than they treated Kennedy Winn, a male coworker. (*See id.* at 3, 5–6). LaKemper alleges that Hopper refused to reimburse her expenses, credited Winn's contributions more than similar ones that LaKemper and female coworkers made, attempted to avoid paying LaKemper bonuses and commissions, and joked about LaKemper losing her job. (*Id.* at 3, 5–6). LaKemper alleges further that Hopper terminated her because she and her female coworkers complained to human resources about this differential treatment. (*Id.* at 6–7). Hopper has moved for summary judgment, arguing that LaKemper cannot make a prima facie showing of discrimination under Title VII. (Docket Entry No. 29).

Based on the pleadings, the motion, the response, the reply, the record, and the applicable law, the court grants Hopper's motion for summary judgment. The reasons for this ruling are set forth below.

## I. Background

Hopper is an accredited online travel agency that provides travel products and services to customers around the world through a mobile application and website. (Docket Entry No. 29-3 ¶ 3). In December 2021, Hopper hired LaKemper to serve as a Hotels Market Manager for the region surrounding Houston, Texas. (Docket Entry No. 29-4). LaKemper was responsible for generating business leads and maintaining relationships with partner hotels. (*See id.*; Docket Entry No. 29-2 at 18:1–6). Her salary was $93,000. She also had the opportunity to earn bonuses under Hopper's Sales Incentive Plan. (*See* Docket Entry Nos. 29-4, 29-5).

Hopper tracked employee progress under its Sales Incentive Plan. The Plan used different categories, each with three levels of success—"minimum," "target," and "stretch." Each category was separately weighted, and the criteria shifted frequently. For example, in the second quarter of 2022, Hopper used four different metrics:

| Performance Market: Greater Houston Area | | | | |
|---|---|---|---|---|
| Market Manager: Elizabeth LaKemper | Quarterly Targets | | | |
| | Minimum | Target | Stretch | Weighting |
| Direct Properties Onboarded | 15 | 30 | 60 | 10% |
| Direct Booking Share Shift | 4.20% | 8.50% | 16.90% | 30% |
| Preferred Properties Onboarded | 8 | 15 | 30 | 15% |
| Preferred Booking Share Shift | 3.50% | 6.50% | 13.00% | 45% |
| | | | | |
| Salary payout (percentage of base salary for the period) | *25%* | *50%* | *100%* | n/a |

(Docket Entry No. 29-5 at 4). In the third quarter of 2022, Hopper used three somewhat different categories:

| Market Manager: Elizabeth LaKemper | Incentive Period One (July 1 - Aug 15 targets) | | | |
|---|---|---|---|---|
| | Minimum | Target | Stretch | Weighting |
| Deal count of Direct Properties Onboarded | 4 | 8 | 12 | 65% |
| Performance Market Win-Rate | 58.9% | 80.0% | 85.0% | 15% |
| Performance Market Direct Bookings to Preferred | 62.7% | 75.0% | 80.0% | 20% |
| | | | | |
| Salary payout (percentage of base salary for the period) | 25% | 50% | 100% | n/a |

(*Id.* at 13).

LaKemper's bonuses varied with her success under the relevant categories. For the first quarter of 2022, LaKemper did not achieve a success level on any of the categories, and she did not receive a quarterly bonus. (Docket Entry No. 29-3 ¶ 8). The next quarter, LaKemper missed her hotel activation target and increase preferred hotel target, but she hit the target for increasing direct share and preferred share, resulting in a bonus payment. (*Id.* ¶¶ 9–10). LaKemper received a bonus in the third quarter based on activations and renegotiations, (*see id.* ¶¶ 11–12), and received a bonus in the fourth quarter based on existing booking metrics, (*see id.* ¶ 13). For the first quarter of 2023, LaKemper received a bonus for meeting the minimum threshold for booking shares. (*See id.* ¶ 14).

LaKemper initially reported to Daniel Rowan. (Docket Entry No. 32-1 at 25:3–5). There were three women on Rowan's team—LaKemper, Laura Brunner, and Whitney Olsen—and one male, Kennedy Winn. (*Id.* at 26:14–23). LaKemper testified in her deposition that Rowan favored Winn over her and her female coworkers. (*See id.* at 57:2–15, 62:15–63:19, 70:6–71:24). LaKemper explained that, for example, when she and her female coworkers offered new ideas on team calls, Rowan would shut them down. (*See id.* at 70:6–71:4). When Winn later made the same suggestion, Rowan praised him. (*Id.*). LaKemper testified that Rowan disputed her "wins"

and tried to avoid giving her credit for the hotel relationships she secured. (*See id.* at 46:4–48:7). LaKemper also testified that Rowan tried to, or did, deny her reimbursement for merchandise expenses that LaKemper incurred while promoting Hopper to hotels. (*See id.* at 55:1–56: 13, 62:3–9). LaKemper testified that Kennedy received a higher bonus than the three women even though he did not hit every performance metric or meet each of his quarterly goals. (*Id.* at 71:6–73:25). LaKemper alleges that Rowan joked about firing her or finding her replacement, contributing to an atmosphere of fear and intimidation for her and female coworkers. (*Id.* at 57:6–15, 65:3–18).

In August 2022, LaKemper, Brunner, and Olsen complained about Rowan to the human resources department at Hopper. (*See id.* at 118:3–119:6). LaKemper met with Michelle Sieklucki, Hopper's head of "People Operations." (*Id.* at 82:7–83:2; Docket Entry No. 29-9). LaKemper told Sieklucki that she "thought the difference in treatment was because of" her "gender." (Docket Entry No. 32-1 at 117:24–118:2). LaKemper testified that she and her coworkers complained about Rowan's use of terms such as "bro-code" and that Rowan put Winn, the only male coworker, "on a pedestal." (*See id.* at 118:3–120:3; Docket Entry No. 29-9 at 3). LaKemper testified that Hopper recognized that the complaint was coming from "three women" and told her that the behavior they described would be investigated and would "not be tolerated." (*See* Docket Entry No. 32-1 at 103:15–105:7). However, Hopper fired Olsen before the investigation concluded in mid-October 2022. (*Id.* at 27:15–28:3, 144:2–13; Docket Entry No. 32-2).

In late October 2022, Hopper reorganized its sales team. (Docket Entry No. 29-3 ¶ 21). As part of the reorganization, LaKemper, Brunner, and Winn were transferred from Rowan's team to a new team under Donna Karnes, a Regional Director in Texas. (*See id.*; *see also* Docket Entry No. 29-2 at 28:1–3). Hopper asserts that it reorganized because a director-level employee in the

Pacific Northwest region resigned, requiring Hopper to shuffle work assignments within the sales division. (*See* Docket Entry No. 29-3 ¶ 22). Rowan took over duties in the Pacific Northwest, in part because he was based in Colorado. (*See id.*). Karnes lived in Texas and was better positioned to work with the Texas-based employees, including LaKemper. (*See id.*). After the reorganization, LaKemper continued to perform the same sales duties in the same territory. (*See id.* ¶ 23; Docket Entry No. 29-2 at 137:12–18). LaKemper had no individual interactions with Rowan after the transfer. (*See* Docket Entry No. 29-2 at 138:12–16).

In December 2022, Karnes approved a salary raise for LaKemper from $93,000 to $98,580. (Docket Entry No. 29-10). Hopper increased LaKemper's salary after Rowan gave her a positive performance review. (*See* Docket Entry No. 29-8 at 7–9). However, according to Hopper, LaKemper did not have a strong start in 2023. She did not meet the minimum expectations for the categories of hotel activation, direct room night achievement, and direct booking. She did meet the minimum expectations for booking shares. (Docket Entry No. 29-3 ¶ 14). Karnes reviewed LaKemper's performance in May 2023 and gave her a scathing review. (Docket Entry No. 29-11). Karnes stated that "[i]t is time to part ways with Elizabeth and let her move on to another company." (*Id.* at 3). Karnes explained that LaKemper was "really struggling in her role as [a] market manager for Houston"; that she made strategic errors by not focusing on "indies or Corpus Christi"; that she did not close "any new hotels in 2023"; and that she was "not well known in the market despite being at Hopper for almost 2 years." (*Id.*). Karnes stated that LaKemper was "not a culture fit." (*Id.*). Although LaKemper "secured a couple of promotions," Karnes did not think that was "enough to make a difference." (*Id.*). LaKemper, in Karnes's words, was "not earning her salary at Hopper." (*Id.*).

Karnes gave LaKemper a failing grade on the "Keeper Test," which asks managers to evaluate whether the employee "impact[s] the top line," "move[s] the needle," "changed [Hopper's] performance," or otherwise meets the "keeper bar." (*Id.*; *see* Docket Entry No. 29-3 ¶ 17 ("The Keeper Test asks the manager to explain why the employee's employment should continue, based on specific examples of how the employee has contributed to the business.")). According to Hopper's Head of People Operations, Jessica Davis, Hopper had used the "Keeper Test" since before 2021. (Docket Entry No. 29-3 ¶ 16). "Employees who fail the Keeper Test are usually terminated." (*Id.* ¶ 18). At the time of her termination, LaKemper was not on track to hit her performance metrics for the second quarter of 2023. (*See id.* ¶ 15). For the six fiscal quarters that Hopper employed LaKemper, she "ranked 41st out of 51 individuals on the U.S. hotels sales team." (*Id.* ¶ 5; *see* Docket Entry No. 29-6).

Hopper terminated LaKemper's employment on May 25, 2023. (Docket Entry No. 29-4 ¶ 24). Davis's affidavit states that Hopper did so because of LaKemper's "downward performance trends" and Karnes's "conclusion" that LaKemper "failed the Keeper Test." (*Id.*). Karnes "made the decision" in "consultation with Karen Connell," Karnes's manager. (*Id.*). Hopper did not terminate Winn's employment. "Winn's median performance score, which is calculated as a percentage of potential bonus payment, was 42.4%." (*Id.* ¶ 25). "By comparison, [LaKemper's] median performance score was 23.1%." (*Id.*). Winn ranked 15th in the company, and LaKemper ranked 41st. (*Id.*).

LaKemper disputes that her performance was the basis for her termination. She testified that Hopper did not tell her that she was being terminated due to poor performance. (*See* Docket Entry No. 32-1 at 142:3–143:10, 150:10–19). According to LaKemper, Hopper gave her the performance rationale only after she "pushed" for an explanation "[a]t the end" of the termination

meeting. (*Id.* at 142:3–8). LaKemper also states that Karnes had not raised her poor performance earlier or provided feedback. (*See id.* at 134:25–137:3). LaKemper testified that her allegedly poor performance in the first quarter of 2023 was understandable because it was a "ramp-up" period—that is, a period when employees are expected to create leads rather than close deals. (*See id.* at 56:15–19). The sudden switch from receiving a pay raise to termination under Karnes's management, she argues, plausibly suggests that she was fired because of her sex. (*See* Docket Entry No. 32 at 7).

LaKemper filed an EEOC discrimination and hostile work environment charge against Hopper. (Docket Entry No. 27 ¶ 23). This lawsuit followed a right-to-sue letter. (*See id.* ¶ 46). Hopper has moved for summary judgment on LaKemper's claims, (Docket Entry No. 29), LaKemper has responded, (Docket Entry No. 32), and Hopper has replied, (Docket Entry No. 36). The motion is ready for ruling.

## II. The Legal Standard

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). "A fact is material if it 'might affect the outcome of the suit.'" *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). When considering a motion for summary judgment, the court "must consider all facts and evidence in the light most favorable to the nonmoving party"

and "must draw all reasonable inferences in favor of the nonmoving party." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and pointing to record evidence demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c). "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which that evidence supports [its] claim." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it]

has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250).

## III. Analysis

### A. Sex Discrimination

Title VII prohibits employment discrimination against "any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). When plaintiffs rely on circumstantial evidence, as LaKemper does here, their "claims are evaluated under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)." *Johnson v. Johnson*, 923 F. Supp. 2d 984, 994 (S.D. Tex. 2013) (collecting cases).

In a Title VII discrimination or retaliation case, under the *McDonnell Douglas* framework, "the plaintiff must first demonstrate a prima facie case of discrimination." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411–12 (5th Cir. 2007). "To state a prima facie case of discrimination under Title VII, the plaintiff must show that she (1) is a member of a protected class, (2) was qualified for the position, (3) was subject to an adverse employment action, and (4) was replaced by someone outside the protected class or, in the case of disparate treatment, show that others similarly situated were treated more favorably." *Johnson*, 923 F. Supp. 2d at 994 (first citing *Bouie v. Equistar Chems. LP*, 188 Fed. App'x. 233, 236–37 (5th Cir. 2006); and then citing *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001)).

If the plaintiff makes a prima facie showing, the defendant "must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff." *Burrell*, 482 F.3d at 411–12. "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful

discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999) (cleaned up). At this stage, "the employer bears only the burden of producing evidence which explains clearly that the employment decision was not pretextual but was motivated by a legitimate, nondiscriminatory reason, for example, a business judgment." *Johnson*, 923 F. Supp. 2d at 994 (citing *Marcantel v. Dep't of Transp. & Dev.*, 37 F.3d 197, 199 (5th Cir. 1994). "[I]f the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic." *Burrell*, 482 F.3d at 412; *accord Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011).

A plaintiff may raise a fact issue as to pretext by pointing to evidence that the employer's "proffered explanation is false or 'unworthy of credence.'" *Vaughn*, 665 F.3d at 636 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). An explanation is false or unworthy of credence if it is not the real reason for the employment action. *Vaughn*, 665 F.3d at 636–37. "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *Laxton*, 333 F.3d at 578. "No further evidence of discriminatory animus is required because 'once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation.'" *Id.* (ellipses omitted) (quoting *Reeves*, 530 U.S. at 147). The "trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147.

"A plaintiff with Title VII or retaliation claims may also maintain her burden through a 'mixed-motive' case." *Johnson*, 923 F. Supp. 2d at 995. "In a mixed-motive case, the employee may show that the employer's proffered reason for taking the adverse employment action, while nonpretextual, is only one of the reasons for its conduct, and that another 'motivating factor' is the plaintiff's protected characteristic." *Id.* (first citing *Woods v. Sheldon Indep. Sch. Dist.*, 232 Fed. App'x. 385, 387 (5th Cir.2007) (per curiam); and then citing *Mack v. John L. Wortham & Son, L.P.*, 2012 WL 5456117, at *6 (S.D. Tex. Nov. 7, 2012)).

LaKemper alleges that Hopper discriminated against her by treating her and other females less favorably than their male colleague, including by refusing to reimburse expenses, denying earned bonuses or commissions, threatening termination, and terminating LaKemper's employment. (Docket Entry No. 27 ¶ 28; Docket Entry No. 32 at 14–15).

**1. Treatment During LaKemper's Employment**

LaKemper alleges that Rowan treated Winn, a male employee, more favorably than LaKemper and her female colleagues with respect to reimbursements, bonuses, and termination. There are three problems with LaKemper's claim.

First, threats of termination, unfair criticism, and the absence of praise, are not themselves discrimination with respect to LaKemper's "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Harassment and comments at work "must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *Credeur v. Louisiana*, 860 F.3d 785, 795 (5th Cir. 2017) (quoting *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 236 (5th Cir. 2001)). "The Fifth Circuit has previously held that a poor performance evaluation, even when combined with other incidents, does not give rise to a hostile work environment." *Standley v. Rogers*, 202 F. Supp. 3d 655, 674 (W.D. Tex. 2016) (citing *Kang*

*v. Bd. of Sup'rs of La. State Univ.*, 75 F. App'x 974, 977 (5th Cir. 2003)), *aff'd*, 680 F. App'x 326 (5th Cir. 2017). "Criticism of an employee's work performance . . . and even threats of termination do not satisfy the standard for a harassment claim." *Credeur*, 860 F.3d at 796; *cf. McElroy v. PHM Corp.*, 622 F. App'x 388, 390 (5th Cir. 2015) (per curiam) ("Mere verbal threats to fire an employee alone do not make working conditions so intolerable that a reasonable employee would feel forced into involuntary resignation."). And "[c]hastisement by superiors" "does not rise to the level of material adversity that distinguishes an adverse employment action from petty slights, minor annoyances, and simple lack of good manners that the Supreme Court has recognized are not actionable" discriminatory conduct. *Credeur*, 860 F.3d at 789 (cleaned up); *see Chancey v. BASF*, No. 23-40032, 2023 WL 6598065, at *3 (5th Cir. Oct. 10, 2023) (per curiam) (explaining that a "threat of termination" is not a materially retaliatory event, even after *Hamilton v. Dallas County*, 79 F.4th 494, 506 (5th Cir. 2023) (en banc)).

LaKemper testified generally that there was an atmosphere of intimidation and fear. (Docket Entry No. 32-1 at 57:2–15, 64:23–65:18). This evidence is not sufficient to establish sex discrimination. The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21–22 (1993)). "Courts consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance, and whether the complained of conduct undermined the plaintiffs' workplace competence." *Ayres v. ChemJet Int., Inc.*, No. CV H-24-3734, 2026 WL 1948531, at *3 (S.D. Tex. Jan. 15, 2026), *aff'd*, No. 26-20032, 2026 WL 1894445 (5th Cir. July 1, 2026) (cleaned up).

The record is unclear on how frequent and severe Rowan's threats and intimidating comments were, though they were consistent enough that several employees escalated their concerns to human resources. But the final two factors relating to performance cut sharply against LaKemper. There is no record evidence that the allegedly discriminatory threats or comments materially impacted LaKemper's work performance. LaKemper was consistently toward the bottom of Hopper's performance metrics. (Docket Entry No. 29-4 ¶ 24; Docket Entry No. 29-6). Yet she performed well enough under Rowan to earn positive comments from him, (Docket Entry No. 29-8 at 7–9), and a raise, (*see* Docket Entry No. 29-10; *see* Docket Entry No. 29-2 at 137:4–23 (confirming that LaKemper received a raise after working for Karnes for a "very short time")). A reasonable jury could not find that Rowan created a hostile work environment for LaKemper.

Second, Hopper remedied LaKemper's claims about threats of termination, unfair criticism, and her generalized fears through the reorganization. Plaintiffs must show that employers "failed to take effective action" in response to harassment. *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir. 1999); *Cerda v. Blue Cube Operations, L.L.C.*, 95 F.4th 996, 1003 (5th Cir. 2024) (citing *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir. 1986)). LaKemper cannot prove this element because Hopper took "actions that stopped all sexual harassment directed at" LaKemper. *Frazer v. Angelina Coll.*, 67 F. App'x 251, at *1 (5th Cir. 2003) (per curiam). LaKemper raised her concerns with human resources in August 2022; human resources completed its investigation in mid-October 2022; Hopper reorganized its sales team and separated LaKemper from Rowan in late October 2022; and, after LaKemper started reporting to Karnes, she did not "experience any sexism" and was not "held to any double standards." (Docket Entry No. 32-1 at 123:8–20). Although LaKemper "testified that she remained uncomfortable"

and Hopper apparently "did not reprimand" Rowan, those facts are immaterial because Rowan's "conduct" toward LaKemper "ceased its offensive nature." *Skidmore*, 188 F.3d at 616.

Third, LaKemper has not shown that she was treated differently with respect to reimbursements, bonuses, or other tangible terms and conditions of her employment. LaKemper identifies Winn, a male in her group, as the relevant comparator. "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Perez v. Tex. Dep't of Crim. Just.*, 395 F.3d 206, 213 (5th Cir. 2004)); *accord Wittmer v. Phillips 66 Co.*, 304 F. Supp. 3d 627, 634 (S.D. Tex. 2018), *aff'd*, 915 F.3d 328 (5th Cir. 2019). "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Lee*, 574 F.3d at 260 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).

The parties' arguments do not discuss the reimbursements that Winn requested and received, the bonuses that he received, and the other tangible benefits afforded to him. The record does not include this evidence. There is no way to compare what reimbursements Winn and LaKemper did (or did not) receive, what bonuses Winn and LaKemper did (or did not) receive, and what other tangible employment benefits Winn and LaKemper did (or did not) receive. The only evidence in the record supporting LaKemper's claims is her testimony that Winn received bonuses and reimbursements and that she did not receive bonuses and reimbursements. But without more, LaKemper's arguments are a resort to "self-serving generalized testimony stating her subjective belief that discrimination occurred," which is "simply insufficient to support a jury

verdict in plaintiff's favor." *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994). Without deposition testimony from Winn or business records from Hopper showing his reimbursements and bonuses, there is no way to determine whether LaKemper and Winn are so similarly situated that disparate treatment creates an inference of sex discrimination. LaKemper bears this burden of production. *See Celotex Corp.*, 477 U.S. at 323. The difference in the reimbursement requests or their performance could explain the difference in treatment. *See Lee*, 574 F.3d at 260.

Hopper argues that Winn was a high-achieving employee and that LaKemper was not. (*See* Docket Entry No. 29-3 ¶ 25). LaKemper argues that Hopper's metrics are uninformative. (*See* Docket Entry No. 32 at 6–7). She testified that performance metrics changed constantly. (*See* Docket Entry No. 32-1 at 126:3–127:22). But LaKemper has not introduced evidence that Hopper applied its metrics differently to Winn. LaKemper instead acknowledged that Hopper's shifting metrics were a company-wide issue. (*See id.* at 30:9–15). Nor has LaKemper shown that Hopper based its bonuses on something other than its performance metrics, or that LaKemper's performance was in fact comparable to Winn's based on some other relevant metric. Other than Hopper's evidence on Winn's performance metrics, there is no evidence about how Winn performed. There is no testimony from Winn or from Rowan in the summary-judgment record. LaKemper's testimony that Winn received bonuses that she did not cannot support a jury verdict in her favor. *See Lee*, 574 F.3d at 260; *Grizzle*, 14 F.3d at 268.

Hopper is entitled to summary judgment on LaKemper's sex-discrimination claim based on her treatment during her employment.

**2. The Termination**

LaKemper also argues that she was terminated in part because of her sex. (*See* Docket Entry No. 32 at 14–15). LaKemper's "ultimate burden" is to "prove that the actual decisionmaker was motivated by [sex] in taking the adverse employment action." *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 902 (5th Cir. 2012); *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002); *see Paugh v. Lockheed Martin Corp.*, 474 F. Supp. 3d 861, 868 (W.D. Tex. 2020) ("The inquiry focuses on the decision maker because ultimate employment decisions are performed by either ultimate decision-makers or those with influence over the ultimate decision-makers."). But Rowan, the only individual at Hopper alleged to have treated LaKemper unfairly because of her sex, was not involved in LaKemper's termination. Karnes and Connell "made the decision" to terminate LaKemper. (Docket Entry No. 29-3 ¶ 24). And LaKemper testified that after she was transferred to Karnes, she did not "experience any sexism" and was not "held to any double standards." (Docket Entry No. 32-1 at 123:8–20). Karnes and Connell were not deposed, or the parties did not place their depositions into the record. The record does not include other evidence relating to the termination decision. In short, there is no evidence in the record that Karnes and Connell—and as a result, Hopper—terminated LaKemper because of her sex.

Hopper is entitled to summary-judgment on LaKemper's sex-discrimination claim based on her termination.

**B. Retaliation**

Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because he has opposed an unlawful employment practice under this subchapter." 42 U.S.C. § 2000e–3(a). LaKemper alleges that Hopper "retaliated against Plaintiff by transferring her to another team, closing the human resources investigation, and

terminating her employment after she engaged in protected activity by filing a complaint about Mr. Rowan's discriminatory behavior." (Docket Entry No. 27 ¶ 35).

"To establish a prima facie case of retaliation, the plaintiff must establish that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007) (first citing *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003); and then citing *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)). "If a plaintiff makes a prima facie showing, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the employment action." *Memon v. Deloitte Consulting, LLP*, 779 F. Supp. 2d 619, 634 (S.D. Tex. 2011). "If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation." *Id.* "The standard of proof on the causation element of a Title VII claim is that the adverse employment action taken against the plaintiff would not have occurred 'but for' her protected conduct." *Id.* (first citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); and then citing *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004)).

The court notes, at the outset, that there is no evidence that Hopper retaliated against LaKemper by transferring her to another team or closing the human-resources investigation. The record is clear that LaKemper transferred her to Karnes's team as part of a larger reorganization prompted by a manager's resignation, (Docket Entry No. 29-3 ¶ 22), that Winn was transferred with LaKemper to work under Karnes, (Docket Entry No. 29-2 at 28:1–3), and that LaKemper had the same duties, (Docket Entry No. 29-2 at 137:12–18), and did not face harassment or discrimination under Karnes, (Docket Entry No. 32-1 at 123:8–20). The transfer and closing of

the human-resources investigation was not retaliatory. *Cf. Skidmore*, 188 F.3d at 616. The core of LaKemper's retaliation claim is about her termination, which is what her summary-judgment response focuses on. (*See* Docket Entry No. 32 at 19–28). The core question is whether there is enough "evidence that would 'allow a jury to infer that the actual reason for' her termination 'was discriminatory.'" *Maldonado v. Harris County*, No. CV H-24-1202, 2025 WL 2443389, at *6 (S.D. Tex. Aug. 25, 2025) (quoting *Eugene v. Rumsfeld*, 168 F. Supp. 2d 655, 667 (S.D. Tex. 2001)).

LaKemper's claim starts from a weak factual position because of the length of time between her complaint about Rowan and her termination. LaKemper went to human resources in August 2022, (Docket Entry No. 32-1 at 117:24–119:6), the investigation concluded in mid-October 2022, (Docket Entry No. 32-2), and LaKemper was terminated in May 2023, (Docket Entry No. 29-3 ¶ 24). That is a substantial lapse which by itself is "insufficient to show a causal link." *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 443 (5th Cir. 2007) (per curiam) (collecting cases); *see Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (explaining that a "six-and-a-half-week timeframe is sufficiently close" but a "five month lapse is not close enough, without other evidence of retaliation").

In addition, there is no evidence that Karnes knew of LaKemper's complaints about Rowan. LaKemper did not testify that she told Karnes about or that Karnes knew of her complaints about Rowan. Karnes was not deposed, or the parties did not put her deposition into the record. Karnes issued a scathing review of LaKemper's performance, in which Karnes recommended terminating LaKemper. (*See* Docket Entry No. 29-11). Karnes then made the termination decision "in consultation with Karen Connell." (Docket Entry No. 29-3 ¶ 24). LaKemper argues that a jury could still infer retaliation because Connell knew about LaKemper's complaints to human-

resources. (*See* Docket Entry No. 32-2 at 1–2 (referencing "KC")). But Connell's knowledge only creates the possibility that Karnes knew about LaKemper's complaints. There is no evidence that Connell told Karnes about LaKemper's complaints. Neither their depositions nor evidence, such as emails from their custodial file, are in the record. The possibility that Connell told Karnes about LaKemper's complaints or influenced her performance review is not a plausible one on its own. LaKemper needs more evidence to create an inference of retaliation that a reasonable jury could credit.

LaKemper argues that a jury could infer retaliation from the timing and falsity of Hopper's purported basis for termination. LaKemper argues that a reasonable jury could doubt Hopper's performance rationale because: (1) Hopper's own documents contradict its basis for termination; (2) Hopper's basis for termination was invented after the fact in litigation; (3) Hopper's metrics were everchanging; (4) Hopper fired Olsen before the investigation into Rowan closed; and (5) she recently signed a major Club Quarters brand deal. (Docket Entry No. 32 at 23–25). The record does not support these arguments.

First, Hopper's documents are not inconsistent on LaKemper's work performance. LaKemper argues that Sieklucki's notes acknowledged that "EL has been hitting targets past few quarters so hasn't had as many conversations around performance." (Docket Entry No. 32-2 at 2). No reasonable jury could interpret human-resource-meeting notes as a document crediting LaKemper's performance. This comment is from an August 8, 2022, Google Meet between LaKemper and Sieklucki. Sieklucki clearly transcribed LaKemper's statements as the meeting went on. For example, the bullet point above the one that LaKemper cites states that "[o]verall DR is not very helpful." (*Id.*). Sieklucki did not reach the conclusion that Rowan was an unhelpful manager in that meeting. She recorded LaKemper's thoughts about Rowan, just as she recorded

LaKemper's statements about her own performance. There is no internal inconsistency in Hopper's files that a jury could rely on to find pretext.

Second, Hopper did not invent its concerns about LaKemper's performance after the fact. Karnes reviewed LaKemper's performance before she was terminated. (Docket Entry No. 29-11). LaKemper also testified that, "[a]t the end" of her termination meeting, "after pushing," Hopper told her that it was terminating her because she was "not hitting" her "metrics." (Docket Entry No. 32-1 at 142:3–8). Even if Hopper's first justifications—that it was "just not working out" or that she was "not a good fit," (*see* Docket Entry No. 32 at 23)—were general, Hopper is not being inconsistent by providing more details now in litigation, especially when those details predated LaKemper's termination. *Cf. Mire v. Texas Plumbing Supply Co.*, 286 F. App'x 138, 143 (5th Cir. 2008) (per curiam) (lack of documentation does not necessarily prove falsity). There is no genuine dispute on Hopper's stated reason for terminating LaKemper.

Third, Hopper's everchanging metrics do not create a reasonable inference of retaliation, precisely because they were everchanging. There is no dispute that Hopper constantly changed its metrics. But there is also no dispute that Hopper constantly changed its metrics for everyone. LaKemper testified that "there were complaints about shifting goals in other teams around the company." (Docket Entry No. 32-1 at 30:9–15). Hopper constantly changed metrics because, as LaKemper conceded, it was a "fast-paced startup" with an "environment" where things "shifted frequently." (*Id.* at 132:7–14). Whether or not it was wise for Hopper to constantly change its metrics is irrelevant because Title VII does not condemn poor business judgments. *See T Price v. Rosiek Const. Co.*, 509 F.3d 704, 708 (5th Cir. 2007) ("Title VII is not a vehicle for second-guessing business decisions."). Because Hopper's metrics changed for everyone, it does not create an inference that Hopper retaliated against LaKemper. The changing metrics do not show that

LaKemper was "singled out in retaliation for engaging in an activity protected by Title VII." *Garrett v. Constar, Inc.*, No. CIV. A. 397-CV-2575R, 1999 WL 354239, at *8 (N.D. Tex. May 25, 1999).

Fourth, there is no evidence about Olsen's termination. The only fact in the record about Olsen's firing is that it occurred before Hopper's investigation into LaKemper's complaints concluded. That means it occurred months before LaKemper was fired and before LaKemper was transferred to work under Karnes. Rowan, not Karnes, likely fired Olsen, casting serious doubt on any link between both terminations. *See Gee*, 289 F.3d at 346 (the focus is on the decisionmaker, not other employees). In addition, the record is far too sparse on Olsen's firing for it to support an inference of retaliation. There is no evidence, either way, on why Hopper fired Olsen. At the same time, Hopper did not appear to fire Brunner, who also complained about Rowan. Because Hopper did not fire Brunner and different decisionmakers were involved, no reasonable jury could find that Olsen's termination is evidence of retaliation against LaKemper.

Lastly, LaKemper's Club Quarters brand deal does not show Hopper's performance rationale is a pretext. "Hopper does not dispute that, other than her first quarter, [LaKemper] hit at least one performance metric each quarter, which resulted in her getting a bonus." (Docket Entry No. 36 at 8). LaKemper's brand deal contributed to her metrics and her bonus. But it does not follow that her overall performance was satisfactory to Karnes, her new manager, who issued the poor review that led to her termination. LaKemper has not shown that the metrics Hopper now purports to rely on do not reflect her true performance. There is no evidence, for example, of the revenue that LaKemper generated for Hopper through her deals or other valuable work that Karnes refused to credit towards her metrics or bonuses. LaKemper's bare testimony that she performed well enough to keep her job does not support a jury verdict. *Grizzle*, 14 F.3d at 268.

To be sure, there is some record evidence that LaKemper was an adequate employee. Rowan issued a passing review, (Docket Entry No. 29-8), which led to a modest raise, (Docket Entry No. 29-10). But the fact that Rowan thought more highly of LaKemper's performance than Karnes did is not evidence of discrimination. Nor did Karnes act inconsistently by approving a modest raise on the back of Rowan's stronger performance review but later, after months of supervision, deciding that LaKemper's performance was not adequate. *See Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995) (holding that a prior favorable evaluation and the receipt of two bonuses did not create a triable factual issue on pretext); *Clay v. City of Chicago Dep't of Health*, 143 F.3d 1092, 1094 (7th Cir. 1998) (same). To prove pretext, LaKemper must show not that her performance was "in fact" adequate but that Hopper "[un]reasonably believed" that her performance was inadequate at the time of her termination. *See Chamblee v. Mississippi Farm Bureau Fed'n*, 551 F. App'x 757, 760 (5th Cir. 2014) (per curiam) (the question is "whether the employer reasonably believed the employee violated the policy and acted based on that belief"). There is no evidence in the record that LaKemper's performance was so strong that Hopper's decision to fire her on Karnes's poor-performance review was a pretext for retaliation.

Because the burden to prove the "ultimate question" of intentional discrimination rests with LaKemper, and because she has not submitted or identified enough evidence to "allow a jury to infer that the actual reason for" her termination "was discriminatory," *Eugene*, 168 F. Supp. 2d at 667 (quoting *Vadie v. Miss. State Univ.*, 218 F.3d 365, 372 (5th Cir. 2000)), the court grants summary judgment on LaKemper's retaliation claims.

## IV. Conclusion

For these reasons, the court grants Hopper's motion for summary judgment. (Docket Entry No. 29). A final judgment is entered separately.

SIGNED on August 5, 2026, at Houston, Texas.

Lee H. Rosenthal
Senior United States District Judge